**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| JOHN BOCCABELLA, Individually And On Behalf Of All Others Similarly Situated, | Civil Action No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| THOMAS GUTIERREZ, KANWARDEV RAJA SINGH BAL, and RICHARD J. GAYNOR, | |
| Defendants. | |

Plaintiff, John Boccabella, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters. Plaintiff's allegations are based on the investigation conducted by Plaintiff's attorneys, which included, among other things: (a) a review and analysis of GT Advanced Technologies Inc. ("GTAT" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of certain press releases, public statements, and other publications disseminated by or concerning GTAT and the defendants named herein and related parties; (c) a review and analysis of GTAT's press conferences, analyst conference calls, conferences, presentations, and corporate website; and (d) a review and analysis of other publicly available information concerning GTAT and the defendants named herein.

I.  **SUMMARY OF THE ACTION**

1.  This is a federal securities class action on behalf of a class consisting of all persons or entities who purchased or otherwise acquired: (1) GTAT's publicly traded securities between November 5, 2013 and October 6, 2014 (inclusive up to 9:40 a.m. Eastern Standard Time on October 6, 2014) (the "Class Period"); (2) securities in or traceable to the Company's

public offering of $214 million in principal amount of 3.00% Convertible Senior Notes due 2020 conducted on or around December 4, 2013 (the "Debt Offering"); and/or (3) securities in or traceable to GTAT's public offering of 9,942,196 shares of its common stock conducted on or around December 4, 2013 (the "Equity Offering"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      GTAT is a leading diversified technology company producing advanced materials and innovative crystal growth equipment for the global consumer electronics, power electronics, solar and LED industries.  In 2010, through its acquisition of Crystal Systems, Inc., the Company entered the sapphire crystal material and equipment business.  On October 31, 2014, GTAT entered into a multi-year agreement to supply its sapphire crystal material to Apple Inc. ("Apple").

3.      During the Class Period, defendants made materially false and misleading statements with respect to GTAT's relationship with Apple, as well as GTAT's capital position. Among other things, defendants represented that the multi-year supply agreement with Apple would be accretive to earnings in 2014 and that GTAT was in a "good capital position." Defendants knew, or but for their reckless disregard for the truth, would have known, that GTAT would not be able to meet the requirements of the Apple supply agreement without experiencing significant cash-flow problems and that GTAT was facing a liquidity crisis, or soon would be, given its failure to meet the requirements of the Apple supply agreement.  In fact, GTAT knew at the time of its public statements during the Class Period that it was in a precarious financial position, that its revenue guidance for 2014 was inflated because Apple would not be using its

sapphire materials in the new iPhone, and that GTAT would not be ending the year with $400 to $450 million in cash, as it had represented.

4.      On October 6, 2014, after the market opened, GTAT disclosed that it had "commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire."  According to GTAT, "as of September 29, 2014 it had approximately $85 million of cash" and was "facing a severe liquidity crisis."

5.      On this news, GTAT common stock declined $10.25 per share or more than 92%, to close at $0.80 per share on October 6, 2014.

## II.      JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

8.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as GTAT's principal place of business is located within this District.

9.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.      THE PARTIES

10.      Plaintiff, John Boccabella, purchased GTAT securities in reliance on defendants' materially false and misleading statements and omissions of material facts and the integrity of

#181337v3

the market for GTAT securities at artificially inflated prices during the Class Period, and was damaged when the truth about GTAT that was misrepresented and omitted during the Class Period was revealed to the market.

11.    Defendant Thomas Gutierrez ("Gutierrez") has served as the President and Chief Executive Officer of GTAT since October 2009.

12.    Defendant Kanwardev Raja Singh Bal ("Bal") has served as GTAT's Vice President since January 13, 2014 and Chief Financial Officer since March 7, 2014.

13.    Defendant Richard J. Gaynor ("Gaynor") served as GTAT's Vice President and Chief Financial Officer from March 2010 until March 6, 2014.

14.    Defendants Gutierrez, Bal and Gaynor are referred to herein as the "Defendants."

## IV.    THE RELEVANT NON-PARTY

15.    Relevant non-party GTAT is a diversified technology company producing advanced materials and equipment for the global consumer electronics, power electronics, solar and LED industries.   The Company's products are designed to accelerate the adoption of advanced materials that improve performance and lower the cost of manufacturing.   GTAT was originally incorporated in Delaware as GT Solar International, Inc. in September 2006, and in July 2008, the Company completed its initial public offering.   The Company is headquartered in Merrimack, New Hampshire and sells its products worldwide.   GTAT's common stock trades on the NASDAQ under the ticker symbol "GTAT."    GTAT is not named as a Defendant in this action because it filed for bankruptcy under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire on October 6, 2014.

## V.    CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action as a class action on behalf of a Class, consisting of all persons or entities who purchased or otherwise acquired: (1) the publicly traded securities of

4

GTAT during the Class Period (November 5, 2013 through October 6, 2014, inclusive up to 9:40 a.m. Eastern Standard Time on October 6, 2014); (2) securities in or traceable to the Company's Debt Offering; and/or (3) securities in or traceable to the Company's Equity Offering, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of GTAT, at all relevant times, members of their immediate families (as defined in 17 CFR § 240.16(a)-1) and their attorneys, legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

17.     This action is brought pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

18.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are potentially thousands of members in the proposed Class.  During the Class Period, approximately 138 million shares of GTAT common stock were outstanding.  The proposed Class may be identified from records maintained by GTAT or its transfer agent and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff purchased GTAT securities during the Class Period and was damaged by Defendants' violations of the Exchange Act.  All members of the Class are similarly affected by Defendants' wrongful conduct.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

Plaintiff has no interests antagonistic to or in conflict with the Class it seeks to represent.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> a.  whether Sections 10(b) or 20(a) the Exchange Act, or Rule 10b-5 promulgated thereunder, were violated by Defendants' acts as alleged herein;
>
> b.  whether GTAT's filings with the SEC, including its quarter-end and year-end reports, the documents referenced therein, and/or subsequent public statements by Defendants on behalf of GTAT were materially false or misleading;
>
> c.  whether Defendants acted with scienter in misrepresenting and/or omitting to state material facts;
>
> d.  whether the market price of GTAT securities was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein; and
>
> e.  to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

## VI.   FACTUAL ALLEGATIONS

### A.   Background of the Company

23.    GTAT is a diversified technology company producing advanced materials and equipment for the global consumer electronics, power electronics, solar and LED industries.  The Company had traditionally been an equipment company serving the solar industry with a leadership position in two areas: (i) the equipment and services that enable the production of low-cost, high-quality polysilicon and (ii) silicon casting furnaces that produce multicrystalline ingots used in the production of solar cells.  However, with the acquisition of Crystal Systems, Inc. in 2010, the Company entered the sapphire material and equipment business, with a focus on providing sapphire furnaces for the global LED and certain other industrial markets.  The Company currently operates through three business segments: the photovoltaic ("PV") business, the polysilicon business and the sapphire business.

24.    The sapphire business manufactures and sells sapphire material and sapphire growth equipment.  Sapphire is a material known for its hardness and is used for a variety of purposes in electronics, including the manufacture of light-emitting diodes.  Sapphire is gaining popularity in portable devices because it is transparent and more scratch-resistant than glass. The Company's sapphire material is manufactured using GTAT's advanced sapphire crystal growth furnace, or ASF system.  According to the Company, Fiscal Year 2013 was a transition year for GTAT's sapphire business as GTAT changed its sapphire business model from being primarily an equipment supplier to also being a sapphire materials supplier.

### B.   Agreements with Apple

25.    On October 31, 2013, GTAT and Apple entered into a Master Development and Supply Agreement and related Statement of Work (the "MDSA"), pursuant to which GTAT

agreed to supply sapphire material exclusively to Apple.   Under the terms of MDSA, the Company granted Apple exclusive rights with respect to sapphire materials manufactured with ASF units operated by GTAT, subject to certain exceptions, and granted certain intellectual property rights in connection with sapphire growth and related technologies, including rights with respect to new sapphire technologies created by GTAT.   While the MDSA specified minimum and maximum supply commitments for GTAT, there are no purchase requirements by Apple under the terms of the MDSA.

26.   On the same date, GTAT also entered into a Prepayment Agreement with Apple (the "Prepayment Agreement" and, together with the MDSA, the "Apple Agreements"), pursuant to which the Company became eligible to receive $578 million (the "Prepayment Amount") in four separate installments, as payment in advance for the purchase by Apple of sapphire materials.   Under the terms of the Prepayment Agreement, the Prepayment Amount must be used by GTAT to purchase components necessary for the manufacture of ASF systems and related equipment principally for use at a Mesa, Arizona manufacturing facility.[1]   GTAT is required to repay the Prepayment Amount ratably over a five-year period ending in January 2020, either as an offset to amounts due from Apple for the purchase of sapphire material under the MDSA or as a direct cash payment to Apple.

27.   Under the terms of the Prepayment Agreement, GTAT's obligation to repay the Prepayment Amount may be accelerated, or the Prepayment Amount may be cancelled prior to payment, under certain circumstances, including if the ASF systems do not generate sapphire material to specification prior to an agreed upon date or if GTAT is unable to comply with

---

[1] On October 31, 2013, GTAT entered into a lease agreement with an affiliate of Apple in order to lease a facility in Mesa, Arizona that GTAT will use for the purpose of manufacturing the sapphire goods under the MDSA.

#181337v3

certain financial covenants (such as having a cash balance of at least $125 million).

28.     Furthermore, GTAT's obligations under the Prepayment Agreement and the MDSA are secured by certain of its assets.  Pursuant to the Prepayment Agreement, Apple was granted a senior security interest in all of the assets and capital stock of GTAT Corporation, the Company's primary domestic operating subsidiary.  As explained in further detail below, this security interest was released by Apple in connection with the completion of the Debt Offering and the Equity Offering on or around December 4, 2013.  However, Apple continues to hold a security interest in the ASF units purchased pursuant to the Prepayment Agreement, as well as in the equity interests of the GTAT subsidiary that owns those units (GT Advanced Equipment Holding LLC).[2]

### C.     Defendants' False and Misleading Statements during the Class Period

29.     On November 4, 2013, after the market closed, GTAT issued a press release announcing that it had "entered into a multi-year supply agreement with Apple Inc. to provide sapphire material."  The press release was filed with the SEC as an exhibit to a November 4, 2013 Form 8-K signed by Defendant Gutierrez.  In the press release, the Company indicated that it will produce sapphire material for Apple at a facility in Mesa, Arizona, that Apple will provide GTAT with a prepayment of approximately $578 million, and that GTAT will reimburse Apple for the prepayment over five years, starting in 2015.  In addition, the Company stated that while the agreement does not guarantee volumes, it does require GTAT to maintain a minimum level of capacity.  In the press release, the Company indicated that while gross margins from this agreement are "expected to be substantially lower than GT's historical equipment margins," it

---

[2] In connection with the agreements entered into with Apple, the Company also established a wholly-owned subsidiary, GT Advanced Equipment Holdings LLC (the "LLC"). This entity is the legal owner of the ASF systems and related equipment that is being purchased with the Prepayment Amount and, as noted above, the assets and equity interests of the LLC secure the Company's obligations under the MDSA and the Prepayment Agreement.

#181337v3

believed that "the strategic nature of [the] agreement and the benefits associated with building a recurring revenue stream are important to its continued diversification."  Moreover, the Company represented that it now expected 2014 revenues to be in the range of $600 to $800 million, with its sapphire segment (including its Apple business) comprising up to approximately 80% of the year's total revenue.

30.    In this press release, Defendant Gutierrez described GTAT's multi-year supply agreement with Apple as a "significant milestone in GT's long term diversification strategy" and represented that it was in the "long-term best interests" of the Company:

> We believe that it is in the long-term best interests of our company, employees and shareholders to build a robust sapphire business with recurring revenues. By leveraging the new materials operation and our enhanced R&D efforts, we will be well positioned to drive the growth of other sapphire opportunities, including the expansion of our LED and industrial sapphire businesses in partnership with our ASF customers.

31.    In this same press release, the Company also announced its financial results for the Third Quarter 2013.  Specifically, the Company announced that its revenue for the Third Quarter 2013 fell to $40.3 million from $168.3 million in the previous quarter and $110.1 million in the same quarter of 2012.  Furthermore, at the end of the Third Quarter 2013, the Company's cash balance totaled $258.5 million.  According to the press release, the Apple Agreements had a negative impact on Third Quarter 2013 results:

> To service the sapphire material agreement announced today, the company has dedicated the vast majority of its ASF capacity in the second half of 2013 to expanding its own material capacity. This shift in business model has effectively precluded the company from shipping significant levels of ASF units to other customers during the second half of 2013 and will continue to do so for the balance of the year. Q3 results . . . reflect this shift in strategy.

32.    Also on November 4, 2013, after the market closed, GTAT held its Third Quarter

2013 Earnings Conference Call.   Defendants Gutierrez and Gaynor participated in the call. During the call, after reviewing the broad terms of the Apple Agreements, Defendant Gutierrez stated that GTAT had "dedicated the vast majority of [its] current ASF capacity to support this multi-year commitment" and that the exclusivity obligations under the agreement "will limit GT's range of future business outside of the LED, industrial and specialty markets it currently serves."   However, Defendant Gutierrez reiterated that GTAT has "confidence in the long-term value of this opportunity given the financial and technical resources that both parties are dedicating to the project" and that GTAT "expect[s] this arrangement to be cash positive and accretive to earnings starting in 2014."

33.     During this call, Defendant Gutierrez also provided a "general sense of [GTAT's] expectations for [the Company's] business model going forward."   Specifically, Defendant Gutierrez indicated that the Company expected "positive earnings on a non-GAAP basis in 2014, representing a significant improvement over 2013" and strong financial results over the next three years:

> In the longer range, we expect revenues in 2015 which will benefit from the introduction of many of the new equipment products that we discussed today to exceed $1 billion. During 2015, we expect the contribution from our other equipment products to increase on a percentage basis as they gain traction. By 2016, driven largely by the incremental strength from our equipment businesses and continued contribution from our Sapphire Materials business, we expect our revenue to nearly double from 2014 levels.
>
> Taking all factors into account, we expect to deliver substantial year-over-year earnings growth over the next three years.

34.     Also during this call, Defendant Gaynor indicated that GTAT was in a "good capital position" and would consider looking for more capital over time:

> We expect the year ending cash balance in the range of $340 million to $380 million. Our cash balance forecast takes into

11

account the effects of the arrangement with Apple as well as operational cash flow expectations. As noted earlier, we are exploring financing alternatives and intend to seek additional capital over time. This is not reflected in our year end cash expectation.

35.     During the call, Defendant Gutierrez refused to provide analysts with any details regarding expected revenue numbers associated with the Apple Agreements, what types of materials are covered under its exclusivity obligations, the ramp structure (i.e. timing) for the manufacturing of the sapphire materials contemplated by the Apple Agreements, and what applications Apple may use these sapphire materials for.   However, later, in response to an analyst question regarding whether the Apple Agreements had "any roadmap provision in terms of cost," Defendant Gutierrez stated that he was confident that GTAT would reach the targets contemplated in the Apple Agreements:

> Q – Jed E. Dorsheimer [Canaccord]: Okay. And then in terms of, is there any roadmap provision in terms of cost. And basically I just want to find out what the risk would be – if there is a cost that's not achieved, would you end up basically owning this facility and would allow Apple to walk away? Would you mind just commenting on that?
>
> A – Thomas Gutierrez: I would say that any customer that enters into such a broad agreement with a supplier and the supplier that's involved must have a fairly high degree of confidence that they can get to where the targets are.
>
> Q – Jed E. Dorsheimer: Okay.
>
> A – Richard J. Gaynor: On both sides.
>
> A – Thomas Gutierrez: On both sides.

36.     On the news of the Company's multi-year supply agreement with Apple, GTAT common stock increased $1.72 per share or more than 20%, to close at $10.10 per share on November 5, 2013.

37.     On November 7, 2013, GTAT filed its Third Quarter 2013 quarterly report with the SEC.  The quarterly report was filed on Form 10-Q and signed by Defendants Gutierrez and Gaynor.  In the quarterly report, GTAT reported that as of September 28, 2013, it had a cash balance of $258.5 million.  GTAT also stated that it "believe[d] that [its] existing cash, as well as cash that [it is] eligible to receive under the Prepayment Agreement with Apple Inc., which will be used principally in connection with [its] sapphire material operations at [its] Arizona facility, cash [it] received on its 3.0% convertible notes and customer deposits will be sufficient to satisfy working capital requirements, commitments for capital expenditures, and other cash requirements for at least the next twelve months."

38.     On or around December 4, 2013, the Company issued $214 million aggregate principal amount of 3.00% Convertible Senior Notes due 2020 (the "2020 Notes").  The net proceeds from the issuance of the 2020 Notes were approximately $206.5 million.  The 2020 Notes are senior unsecured obligations, which pay interest in cash semi-annually at a rate of 3.00% per annum.  Concurrent with the 2020 Notes offering, the Company issued a total of 9,942,196 million shares of common stock at a price of $8.65 per share.  The net proceeds from this common stock issuance were approximately $81.6 million.  In connection with the receipt of proceeds from the 2020 Notes offering and the concurrent stock offering, Apple's security interest in the assets of and equity interests in GTAT Corporation, the Company's primary domestic subsidiary, were released.  However, Apple continues to hold a security interest in the ASF units purchased with the Prepayment Amount as well as the equity interests of the LLC, the GTAT subsidiary that owns those ASF units.

39.     On February 24, 2014, before the market opened, GTAT issued a press release announcing its financial results for the Fourth Quarter and Fiscal Year 2013.  The press release

was filed with the SEC as an exhibit to a February 24, 2014 Form 8-K signed by Defendant Gutierrez.  In the press release, the Company announced that its revenue for Fiscal Year 2013 fell to $299 million compared to $733.5 million for Fiscal Year 2012.  The Company reiterated that it had "made the strategic decision to forego ASF equipment sales while building out its new sapphire materials capacity" and that this decision has had, and will have, a "clear negative impact on the [C]ompany's fourth quarter and full year results for 2013 and near term future results."  Nevertheless, GTAT stated that it expected "that 2014 will be a transformational year, one in which it builds a sapphire materials business while continuing to invest in new technologies that will drive its equipment business in 2015 and beyond."

40.    Furthermore, in the press release, the Company stated that it expected that "revenue and profitability will be back end loaded, with its sapphire materials business ramping up as the year progresses, and with improving financial performance during the second half of 2014."  Specifically, GTAT stated that it expected revenues to range from $600 million to $800 million in 2014, with approximately 15% of revenues occurring in the first half of the year.

41.    In this same press release, the Company noted that in the Fourth Quarter 2013 it had received the first of a series of prepayments pursuant to the Prepayment Agreement, as well as received net proceeds of approximately $290 million from the 2020 Note offering and concurrent common stock offering.  Furthermore, the Company indicated that it had used some of its cash to pay off GTAT's outstanding term loan of $96 million.  As a result, the Company indicated that at the end of the Fourth Quarter 2013 its cash balance was $593 million.  The Company stated that it expected its cash balance at the end of Fiscal Year 2014 to be in the range of $400 million to $500 million.

42.    In the press release, Defendant Gutierrez stated that the Company's "results for

14

the December quarter were in line with [the Company's] guidance and the anticipated growth trajectory of [GTAT's] business remains unchanged."  Furthermore, Defendant Gutierrez noted that the Company had "worked to ensure that [its] balance sheet continues to provide [the Company] with the strategic and operational flexibility necessary to take advantage of the many growth opportunities that [it had] identified."  Finally, Defendant Gutierrez provided an update on its multi-year supply agreement with Apple:

> Our arrangement to supply sapphire materials to Apple is progressing well and we started to build out the facility in Arizona and staff the operation during the quarter. We are pleased to have Apple as a sapphire customer and to be in a position to leverage our proprietary know-how to enable the supply of this versatile material. While our primary focus during the balance of the year is to continue to execute on our commitments in Arizona, our aim is to position GT not only as an exceptional sapphire supplier to Apple but also as an unparalleled world-class supplier of sapphire material and equipment to a variety of customers.

43.     Also on November 4, 2013, after the market closed, GTAT held its Fourth Quarter 2013 Earnings Conference Call.  Defendants Gutierrez and Gaynor participated in the call.  During the call, Defendants Gutierrez and Gaynor indicated that GTAT had now received the first two prepayments under the Prepayment Agreement for a total of $225 million in prepayments from Apple.  Then, after reviewing GTAT's business outlook for Fiscal Year 2014 and indicating that GTAT "expect[s] to return to profitability during the second half of 2014," Defendant Gutierrez provided additional guidance through Fiscal Year 2016:

> Although, it's not the norm for us to provide guidance beyond the current year, at this time, we believe that given some visibility into 2015 and 2016, we can help shape appropriate expectations as we move through this period of transformation. We believe that are revenues in 2015 will exceed $1 billion and profits will sequentially improve. Well, there are many variables that could influence our profitability, such as tax rate, share count, end market conditions, and product and geographic mix. We are increasing our target of non-GAAP EPS for 2016 to be at or above

15

$1.50 per share, as we benefit from the evolution of our equipment business and build upon our base of recurring materials revenue.

44.    Later, in response to analyst questions regarding GTAT's long term targets, Defendant Gutierrez represented that the Company's confidence level in its bottom line had grown:

> Q – Krish Sankar [Bank of America Merrill Lynch]: All right. And then just to follow up on the long-term targets that you guys gave, really very helpful. I did notice that you spoke about $1.50 in earnings in 2016. And I remember in the last call you guys mentioned that 2016 revenues would be double of 2014. So is it fair to assume that target is still intact?
>
> A – Thomas Gutierrez:  We didn't comment on the revenue this time around, but as is obvious, our confidence level in the bottom line has grown as we've gotten feedback on our equipment businesses, and in our new offerings and the new solar technology that we're going to be introducing here in the middle of March, which we're very excited about. And so I can't give you any additional revenue color other than to just reassert that, yes, we feel very comfortable in that bottom line being equal to or greater than $1.50.

45.    During this call, in response to a question about GTAT's guidance on its cash balance, Defendant Gaynor explained how the Company arrived at its $400 million to $500 million end of year guidance:

> Q – Pavel S. Molchanov [Raymond James]: Okay. And then, looking at the guidance on the cash balance, so if you're starting with $593 million of cash currently and you're going to be between $400 million and $500 million by the end of the year, obviously, some cash usage. Do you expect to be generating net cash in any quarter of 2014 or is it going to be fairly linear?
>
> A – Richard J. Gaynor:  Well, I think the way to think about it is, we started the year with $593 million, we are expecting to get the balance of our prepayments from the Apple agreement, and we've told you the total is $578 million, we've also told you, we have $225 million in by the end of the year. So there's another $350 million to come from that and we've also said that we expect to deploy some $550 million in terms of investment into the Arizona

> facility. So if we use those as the big moving pieces, then you will
> see that we will expect to have some additional cash from
> operations being generated during the year and how much you
> decide within that range of $400 million to $500 million
> conclusion at the end of the year.

46.     On March 10, 2014, GTAT filed its Fiscal Year 2013 annual report with the SEC. The annual report was filed on Form 10-K and signed by Defendant Gutierrez.  In the annual report, GTAT indicated that as of December 31, 2013, it had $498.2 million in cash and cash equivalents, of which $76.3 million was held by foreign subsidiaries.  This represented an increase of $80.1 million over the Company's cash balance at the end of the previous year. According to the Company, the increase was principally attributable to $214 million and $81.6 million of proceeds in connection with the December 4, 2013 issuance of the 2020 Notes and common stock, in addition to the $255.00 million prepayment received from Apple.  In the annual report, GTAT stated that it believed that its "existing cash, customer deposits and prepayment installment proceeds will be sufficient to satisfy working capital requirements, commitments for capital expenditures and other cash requirements for at least the next twelve months."

47.     On May 7, 2014, before the market opened, GTAT issued a press release announcing its financial results for the First Quarter 2014.  The May 7, 2014 press release was filed with the SEC as an exhibit to a May 7, 2014 Form 8-K signed by Defendant Gutierrez.  In the press release, the Company announced that its revenue for the First Quarter 2014 fell to $22.5 million from $32.6 million in the previous quarter and $57.8 million in the same quarter of 2013. However, the Company reiterated its previous guidance for fiscal year 2014 of revenue in the range of $600 to $800 million.    In the press release, Defendant Gutierrez indicated that the Company's First Quarter 2014 results were in line with management's expectations and that

GTAT's sapphire materials business would be ramping up:

> Our results for the March quarter were in line with our expectations. We continue to expect that 2014 will be a transformational and significant year for GT as our sapphire materials business ramps up and we continue to execute on our strategy of investing in new technologies that will help drive growth in 2015 and beyond.

> With respect to our Arizona project, we have now received three of the four prepayments from Apple. We continue to expect our sapphire segment to contribute meaningfully to revenue this year.

48.     Furthermore, in the press release, the Company indicated that it ended the First Quarter 2014 with a $509 million cash balance, as compared to a $593 million cash balance at the end of the previous quarter.  In addition, the Company indicated that it had received the third prepayment from Apple, which was not reflected in this quarter's ending cash balance, and had now received approximately $440 million out of the $578 million it was eligible to receive under the Prepayment Agreement.  Finally, the Company indicated that it "expects that the total prepayments it receives from Apple will fully fund its capital outlays related to the project in Arizona."

49.     On May 8, 2014, before the market closed, GTAT held its First Quarter 2014 Earnings Conference Call.  Defendants Gutierrez and Bal participated in the call.  During the call, Defendants Gutierrez stated that "the anticipated growth trajectory of [GTAT's] business remains consistent with the long-term targets that [it] outlined last quarter."  Furthermore, Defendant Gutierrez indicated that it the Company's "target remains to generate over $ 1 billion in revenue in 2015 and to deliver non-GAAP earnings at or above $1.50 per share in 2016." During this discussion, Defendant Gutierrez explained that he was "confident in [GTAT's] ability to continue to execute on [its] plan" for a number of reasons:

> We're confident in our future for a number of reasons. The

> dynamics in our served markets continue to trend in a positive direction and interest in our ASF, polysilicon, HiCz, and DSS solutions is high. Secondly, we are poised to bring several new game-changing technologies to market that, in combination with our next generation solar products, will add [a] billion dollars of potential to GT's addressable market. And, finally, we expect our sapphire materials business to provide a solid stream of recurring revenues once the build-out in Arizona is complete.

50.    During this call, Defendant Gutierrez also provided an update on its work related to the Apple Agreements:

> With respect to our Arizona project, we have continued to staff up and GT's worldwide workforce has reached approximately 1,000 people. In addition, we have now received 3 of the 4 prepayments we expected from Apple. The second pre-payment was received in Q1 and the third in Q2. This brings total cash received from Apple, to date, to approximately $440 million.
>
> I remain very enthusiastic about our sapphire materials and equipment business and, while we cannot be specific with respect to the production ramp in Arizona, we continue to expect our sapphire business to contribute over 80% of our revenue this year.

51.    During this call, Defendant Bal represented that GTAT ended the quarter with a $509 million cash balance, as compared to a $593 million cash balance at the end of the last quarter.  Defendant Bal indicated that the quarter-over-quarter change reflected approximately $50 million of cash used in operating activities and capital expenditures of $153 million. Defendant Bal also indicated that the total prepayments from Apple would "fully fund [GTAT's] capital outlays related to the Arizona project."  Furthermore, Defendant Bal reiterated that the Company's guidance remained consistent with the outlook they provided last quarter and that the Company continued to expect revenue of $600 million to $800 million concentrated in the second half of the year.  In addition, Defendant Bal stated that while GTAT planned to invest $600 million in capital expenditures weighted toward the first half of the year, which was at the high end of the Company's previous range, it still "expect[ed] year-end cash, cash equivalents

19

and restricted cash of $400 million to $450 million."

52.     Later, in response to analyst questions regarding whether there were any subtle changes within the Company's 2014 guidance, Defendant Gutierrez stated that there were no changes in the Company's trajectory for the year:

> Beyond that, they're really not signaling any changes in our trajectory for the year. We did signal that we're probably going to spend a little bit more on CapEx because some of the acquisitions that we have talked about, the coatings and some of the other things that we're working on, and the Merrimack expansion are likely to take a little bit more CapEx but well within our operating range that we had indicated last quarter. So, no real significant change . . . .

53.     During the call, Defendant Gutierrez also responded to a question about whether Apple will be using GTAT's sapphire materials in any of its products:

> Q – Pavel S. Molchanov [Raymond James]: Thanks for taking the question guys. Kind of a high level one first. As you know, everybody out there is trying to figure out which product Apple will be applying sapphire to. And I know you cannot disclose that, but do you believe that Apple will eventually disclose what those products are? And if so, what might the timetable for that announcement be?
>
> A – Thomas Gutierrez: I think you are assuming that I have all those answers. But I think you'll know what they're doing when they announce it. I can tell you that we're producing sapphire, and that I expect that the sapphire that we produce will be fully utilized. But I can't speak to the applications, the time, the ramp, or any of those other things that are competitively sensitive to my customer.

54.     On May 8, 2014, GTAT filed its First Quarter 2014 quarterly report with the SEC. The quarterly report was filed on Form 10-Q and signed by Defendants Gutierrez and Bal.  In the quarterly report, GTAT noted that its cash balance as of March 29, 2014 was $406.6 million, a decrease of $91.6 million from its cash balance of $498.2 million at the end of the previous quarter.  According to the Company, this decrease was principally attributable to the $152.3

million of purchases and deposits on property, plant, and equipment, mainly for ASF units and associated equipment to be installed in the Mesa, Arizona sapphire material production facility. Furthermore, the Company indicated that as of March 29, 2014, it had experienced significant increases in the amounts reported on the balance sheet for each of the following items: inventory; vendor advances; property, plant and equipment, net; and accounts payable.  The Company attributed these increases to its sapphire material operations in Mesa, Arizona and the production start-up costs associated with qualifying the production at such site.

55.      On June 26, 2014, GTAT issued a press release to announce "a realignment of its manufacturing, engineering and supply chain resources to optimize effectiveness across its increasingly diversified business portfolio."   In the press release, the Company stated that the actions taken "will align previously centralized personnel and operational resources directly with the company's various businesses, which include the rapidly ramping Arizona based sapphire materials business and the expanding equipment businesses."   As part of this action, the Company announced that it would be moving most of its sapphire fabrication activities to its Mesa, Arizona operation.  In the press release, Defendant Gutierrez stated that the "emphasis [of the realignment] is on efficient use of the company's capital as we drive to accelerate new technology to market, rather than pure cost reduction."   Furthermore, Defendant Gutierrez represented that the Company "expect[s] to re-invest most if not all of the cost savings derived from the realignment in our most promising growth programs."

56.      On August 4, 2014, after the market closed, GTAT issued a press release announcing its financial results for the Second Quarter 2014.  The August 4, 2014 press release was filed with the SEC as an exhibit to an August 4, 2014 Form 8-K signed by Defendant Gutierrez.  In the press release, the Company announced that its revenue for the First Quarter

2014 was $58 million, an increase from $22.5 million reported in the previous quarter but still below the $168.3 million in the same quarter of 2013.   In addition, the Company updated its previous guidance for fiscal year 2014 to revenue in the range of $600 million to $700 million, representing the lower end of the previously provided guidance range, and reiterated its 2016 non-GAAP EPS target at or above $1.50.  In the press release, Defendant Gutierrez indicated that "results during the second quarter were in line with [the Company's] guidance" and that the Company remained confident in the potential of the sapphire materials business:

> Results during the second quarter were in line with our guidance. We have continued to see strong interest in our suite of sapphire production tools, including our ASF equipment. In fact, the sapphire segment of our business accounted for over 75% of the revenue in the quarter, with the majority of it related to the sale of sapphire production equipment.
>
> The build-out of our Arizona facility, which has involved taking a 1.4 million square foot facility from a shell to a functional structure as well as the installation of sapphire growth and fabrication equipment, is nearly complete and we are commencing the transition to volume production. We remain confident about the long-term potential of the sapphire materials business for GT.

57.     Furthermore, in the press release, the Company indicated that it ended the Second Quarter 2014 with a $333 million cash balance, as compared to a $509 million cash balance at the end of the previous quarter.  In addition, the Company stated that the Second Quarter 2014 ending cash balance reflected the receipt of the third prepayments from Apple for the Arizona sapphire materials project.  The Company stated that the fourth, and final, prepayment from Apple was "contingent upon the achievement of certain operational targets by GT" but that the Company "expects to achieve these targets and receive the final $139 million prepayment by the end of October 2014."

58.     On August 5, 2014, GTAT held its Second Quarter of 2014 Earnings Conference

Call.  Defendants Gutierrez and Bal participated in the call.  During the call, Defendant Gutierrez stated that the Company was "narrowing [its] consolidated guidance for the year" and now expected "revenue of $600 million to $700 million for 2014, which is at the lower end of [the] previous range."   Furthermore, Defendant Gutierrez stated that the "build-out of [the Company's] Arizona facility . . . is nearly complete, and we're commencing the transition to volume production."  However, while the Company remained "very positive" about its sapphire materials business, Defendant Gutierrez stated that he did "not expect to reach full operational efficiency in Arizona until early 2015." Nevertheless, Defendant Gutierrez represented that he "expects [the Company] to hit [certain operational] targets, and receive the final $139 million prepayment from Apple by the end of October 2014."

59.     Defendant Bal provided additional commentary on the Company's Second Quarter 2014 financial results.  Defendant Bal stated that the results "included the impact of $45 million in sapphire production ramp-up costs" which consisted of "costs incurred in connection with the production inefficiencies and inventory losses associated with the establishment and qualification of production processes in Arizona."  Defendant Bal indicated that these expenses were "greater than anticipated" and reflected "the complexity and challenges we've had ramping the [Arizona] operation."  According to Defendant Bal, the Company expected "to incur up to additional $45 million of production ramp-up costs during the remainder of the year, highly concentrated in Q3."   Furthermore, Defendant Bal indicated that GTAT was tightening its revenue guidance to the lower end of the previous range to "reflect[] our current view of volumes associated with the Arizona project as well as our expectations for sapphire equipment shipments for the second half."  Defendant Bal concluded his commentary by noting that the Company ended the Second Quarter 2014 with $333 million of cash, cash equivalents and restricted cash as

compared to $509 million at the end of the previous quarter, and stated that he "expects year-end cash and equivalents of approximately $400 million."

60.     Later, in response to analyst questions regarding whether the Company would need to raise more cash to get the Arizona facility operational, Defendant Gutierrez indicated that raising additional capital would not be necessary:

> Q – Brian K. Lee [Goldman Sachs]: Hey, guys. Thanks for taking the questions. Just two from my end. I guess first off, how should we think about the level of cash burn for 3Q and 4Q? And do you see the need to raise additional capital to get Arizona scaled up to targeted operational efficiency? And then, I had a follow up.
>
> A – Thomas Gutierrez: Yes. As our guidance for the year suggest, I mean, we're expecting to end the year with approximately $400 million of cash on the balance sheet. And as you know from prior history, this business really starts to generate cash once the order flow and the revenue flow starts to move. So, at the moment, okay, we don't expect [the] need to go out into the marketplace to raise additional capital.
>
> *       *       *
>
> Q – Stephen Chin [UBS]: Okay. And maybe a follow-on to that; if the final prepayment [from Apple] does not come through by the October timeframe, is there an extension possible to that or is there a scenario where you then might need to raise more cash if you don't get that prepayment?
>
> A – Thomas Gutierrez: I would say that the – these are milestone-based. Right? And so when you reach the milestone, you get paid. They're not cliffs per se. And so, I feel very confident based on the progress that we're making that we will achieve the milestone in that timeframe. But as I indicated, with the projection of having close to $400 million in the bank at the end of the year, it's not a world-ending event if it slides, although, again, I don't anticipate that it will slide.

61.     During the call, Defendant Gutierrez also responded to a questions about the Company's relationship with Apple:

> Q – Brian K. Lee [Goldman Sachs]: Okay great. Second question

was just around the Apple relationship, I guess, Tom, given your prepared remarks about the Mesa facility just now moving into production or very shortly and the final Apple prepayment likely set to be received in October, which is a bit behind schedule I think relative to your original expectation. It seems difficult to see how the Apple relationship results in much revenue this year? Are there just very short lead-times once this facility is up and running or is there something else that I might be missing, just trying to reconcile that a little bit? Thank you.

A – Thomas Gutierrez: I understand your question. I have to sort of sidestep it a little bit. I really can't speak to the volumes or the applications or the timing of Apple's business. And we can speak to the fact that we're starting to ramp our production and move into volume manufacturing. We can talk about the startup challenges that we've had. This is one very massive undertaking that we've taken on, but I really can't. And for others that might be on the line that are going to ask me similar questions, really discussed Apple's product line plans or timing (sic).

\*       \*       \*

Q – Krish Sankar [Bank of America]: Got it, got it. That's very helpful. And then a follow up question, just to think about it, if I look at your full year guidance heavily weighted towards Q4 and if [I] look at what your sales run rate in the U.S. has been, it's been extremely low. Is it fair to assume that any shipment of sapphire product is not going to really materialize into any final mobile product this year, given that most of the revenue is going to be in Q4, which means it will be production for next year?

A – Thomas Gutierrez: Yeah, who do you think is going to win the Super Bowl this year? I can't answer that question, obviously. As I indicated, I really cannot comment on Apple's product line plans or timing or revenue streams or anything else like that. I wish I was in a position to do that, but I can't.

62.     On August 7, 2014, GTAT filed its Second Quarter 2014 quarterly report with the

SEC.  The quarterly report was filed on Form 10-Q and signed by Defendants Gutierrez and Bal.

In the quarterly report, GTAT noted that its cash balance as of June 28, 2014 was $333 million, a

decrease of $165 million from its cash balance of $498 million as if December 31, 2013.

According to the Company, this decrease was principally attributable to: (i) a net loss of $128

million during the six month period; (ii) payments of $381 million for the purchase of property, plant and equipment, principally to be used in the Mesa, Arizona sapphire material production facility and (iii) an increase in inventory of $102 million.

63.     In this quarterly report, the Company stated that during the three and six months ended June 28, 2014, the Company had incurred "significant costs in connection with inventory losses and production inefficiencies as a result of the qualification of sapphire growth and fabrication equipment and the establishment of production processes at the [Mesa, Arizona] facility."  In addition, according to the Company, "the capital resources expended in connection with the purchase and installation of production equipment and the costs incurred in commencement of operations [at the Mesa, Arizona] facility have had a significant impact on [its] liquidity and financial results."  However, the Company represented that it was "currently in compliance, and based on the Company's operational plans and financial forecasts, [it] expected to maintain compliance with the operating metrics and financial covenants in the Prepayment Agreement and [GTAT] management believes that the Company will have sufficient cash resources to fund operations for at least the next twelve months."

64.     On August 13, 2014, Defendant Gutierrez presented on GTAT's behalf at the Canaccord Genuity Growth Conference.   During the presentation, Defendant Gutierrez represented that he expected that GTAT would receive the final prepayment from Apple in the October time frame and was sure that the Company would hit the efficiency and cost structure that it was expected to hit under the Apple Agreements:

> Q – Jed E. Dorsheimer [Canaccord]: So given that a lot of the expectations are around the sapphire materials business, could you maybe address some of the additional impressions that came out in the 10-Q with respect to maybe talking about the write-off of some of the materials that are not saleable. I think there are some concerns that – or maybe speak to the conviction that you'll be

able to receive with (sic) the final milestone in October.

A – Thomas Gutierrez: Okay. I think no new news from what I said in the earnings call, not too long ago here. This was a massive undertaking. We had start-up issues associated with bringing up a facility and infrastructure construction, our own equipment, the equipment of others, new processes, et cetera. And we've gotten surprised by the inefficiencies that we've had to deal with as we're bringing that up, pure and simple. That's what we've indicated.

We've indicated that we expect to receive our final payment in the October timeframe. I wouldn't say that if I didn't believe it. And my conviction in terms of the long-term importance of the business to GT remains intact. And as you can see in my picture of the future, while I've got all these other businesses that I'm talking about, our sapphire materials is still a significant part of the business. And so I think beyond that there's not much I can say.

Q – Jed E. Dorsheimer: Maybe just one follow-up if you wouldn't mind. At the time that you struck the deal with Apple, there were certain pricing terms that you agreed to based on certain parameters associated with where you thought you would be in different times. And those are unknown to us, they're redacted as part of the – confidential in terms of relationship. Are there provision that would be – how can you get a catch-up, I guess, is the question I'm coming to in terms of if it's running behind, these are normal startup things, how can we get the confidence that you will be able to get to whatever was agreed up on in that project?

A – Thomas Gutierrez: Okay. Those various mechanisms, as you indicated, that are redacted from the agreements that are in the public domain. We indicated on our call, and I won't go beyond that, that we expect to hit the efficiency, the throughput in the costing structure that we expect to hit by the first quarter of 2015, okay. And we remain very, call it, sure about that.

65.    Defendants, by virtue of their public statements during the Class Period – and as confirmed by analysts' comments after the end of the Class Period – had conditioned investors to expect that the Apple Agreements would be accretive to earnings in 2014 and believe that the Company was in a "good capital position."

66.    The statements referenced in ¶¶ 29-35, 37, and 39-64 above were materially false

and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts: (1) the Company would not be able to meet the requirements of the Apple Agreements without experiencing significant cash-flow problems; (2) the Company was in a precarious financial position, or soon would be, given the covenants of the Apple Agreements; (3) the Company was facing an impending liquidity crisis; (4) the Company's revenue guidance was inflated because GTAT would be unable to meet all of the requirements under the Apple Agreements; (5) the Apple Agreements would not provide GTAT with a recurring revenue stream; (6) GTAT would not receive the final $139 million prepayment from Apple; and (7) GTAT would not end the year with $400 to $450 million in cash on its balance sheet. However, throughout the Class Period, the Company gave no indication of an impending liquidity crisis and continued to make positive statements to investors regarding the Company's cash position, expected cash position and revenues, and ability to meet the requirements under the Apple Agreements.

## VII.   THE TRUTH SLOWLY EMERGES

67.     On September 9, 2014, Apple announced that it was releasing two new models of the iPhone, a 4.7 inch and a 5.5 inch version, neither of which will feature a sapphire faceplate. Furthermore, Apple announced that it was releasing three models of the Apple Watch. Two of the models, "Apple Watch" and "Apple Watch Edition," will feature a sapphire faceplate and a third, "Apple Watch Sport," will feature a glass plate.

68.     On the news of Apple's decision to not feature sapphire displays in its new iPhone, GTAT common stock declined $2.21 per share or more than 12%, to close at $14.94 per share on September 9, 2014.

69.     Defendant Gutierrez appears to have known that Apple had decided to not use a sapphire display in its new iPhones prior to the September 9, 2014 announcement. Indeed, on

September 8, 2014, the day before Apple announced that its new iPhone would not use sapphire screens made by GTAT, Defendant Gutierrez sold more than 9,000 shares of GTAT for $160,000 at an average price of $17.38 per share.  After this announcement, GTAT's shares fell 13% to $14.94 per share on September 9, 2014.  The timing of this sale was particularly unusual given that there was no obvious pattern to Defendant Gutierrez's sales of GTAT shares prior to September 8, 2014.  For example, in May, June and July 2014, Defendant Gutierrez sold shares within the first three days of the month, but then did not sell any additional GTAT shares until September 8, 2014.  Furthermore, while Defendant Gutierrez did not sell any GTAT shares in 2013, he sold nearly 700,000 GTAT shares in 2014 for a value of more than $10 million.

70.     As a result of Apple's decision to not feature sapphire displays in its new iPhones, several securities analysts downgraded their rating of GTAT and lowered their target price.  For example, in a September 9, 2014 investor note, Canaccord Genuity lowered its price target for GTAT to $13.00 from $16.00 but maintained its Hold rating:

> We believe that Apple and GT will still collaborate in commercializing sapphire cover glass; however, today's announcement takes this off the table for 2014 and 1H'15. As such, we don't see how GT can meet its $600-$700M guidance.
>
> *       *       *
>
> We believe GT will need to reset its 2014 targets based on the lack of an iPhone sapphire cover.
>
> While select versions of the Apple Watch will use sapphire crystal, we can't meet expectations based on even the most aggressive Apple Watch assumptions.
>
> We believe default, while perhaps unlikely, needs to be considered when looking at this story and perhaps adds to the risk profile. Given GT's inability to meet its loan obligations with Apple, we see the need to raise additional capital.

71.     Furthermore, on September 10, 2014, Goldman Sachs downgraded GTAT to

neutral from buy and cut its price target to $14.00 from $20.00.  Similarly, in a September 10,

2014 investor note, Piper Jaffray lowered its price target for GTAT common stock to $16.00

from $23.00 and downgraded its outlook to Neutral:

> We are downgrading shares of GTAT to Neutral (from
> Overweight) following Tuesday's Apple event which revealed the
> iPhone 6 will include "ion strengthened glass" but did not mention
> sapphire cover glass in any of its versions. It did, however,
> announce the launch of the Apple Watch in early FY15 with two of
> the three versions containing sapphire.
>
> \*       \*       \*
>
> As we adjust our model, we struggle to hit management's FY14
> revenue guidance of $600-$700 million and are downgrading
> shares due to the uncertainty about how to reconcile our
> assumptions and GTAT management's internal projections. We
> expect GTAT shares to remain volatile but move mostly sideways
> through year-end now that the iPhone 6 launch has passed and we
> see the potential for visibility into sapphire material sales and the
> impact to GTAT's financials to remain opaque until 4Q results are
> reported in February [2015]. Our Neutral stance is balanced by our
> belief that GTAT will ultimately provide the sapphire for the cover
> glass used in the iPhone 6S and iPhone 7, offset by not being
> included in the iPhone 6, limited visibility into sapphire material
> sales, and heightened awareness around the final $139 million
> prepayment from Apple (management expects to receive this by
> the end of October).

72.     Moreover, in a September 10, 2014 investor note, Dougherty & Company LLC

lowered its price target for GTAT stock to $9.00 from $29.00 and downgraded its rating of

GTAT to a Sell:

> The announcement by APPL that there would be no sapphire in
> either of their iPhone models was a very negative surprise for
> GTAT since 80% of sales for 2014 were expected to come from
> sapphire faceplates for the iPhone6.
>
> \*       \*       \*
>
> **This is extremely negative news for GTAT** since the MESA fab
> has been built with a sapphire capacity to support sapphire

faceplates for about 90 million smartphones per year according to our estimates.

\*         \*         \*

**We doubt that Apple will make their final prepayment to GTAT:** Apple was expected to make their final and fourth pre-payment equal to $139MM (out of the originally planned $578MM) by the end of October contingent upon the achievement of certain operational targets by GTAT. Unless Apple is planning to ramp a 3rd iPhone model with a sapphire faceplate it is very unlikely they will make this final payment.

**We have turned negative on the GTAT story** since we believe there will be continued pressure on the stock. We believe it is very likely the stock could retrace down to the $8-$9 range where it was trading before the multiyear announcement was signed on Nov 4 2013 with APPL for the exclusive agreement to supply sapphire to APPL.

73.     According to a *Zacks Investment Research* article dated September 10, 2014, Apple's decision to not feature sapphire displays in its new iPhone may have been caused by concerns over the elasticity of sapphire and its high production costs:

But why did Apple decide against sapphire, at least for now? The reason is likely related to the nature of the material, which while being extremely hard and scratch-resistant is also less elastic. The lower elasticity (or flexibility) makes it more susceptible to cracks that ultimately lead to breaks. This is particularly true when screen sizes are larger, as in the latest iPhones.

The theory also holds water when you consider that the Apple Watch, also unveiled at the event, will use sapphire glass. The smaller screen makes sapphire a better-suited material. In fact, many high-end watches already use sapphire glass.

The high cost and low yields of producing suitable sapphire sheets could also have been a deterrent.

74.     On September 10, 2014, GTAT common stock declined another $2.16 per share or more than 14%, to close at $12.78 per share.

75.     Similarly, according to a *Wall Street Journal* article dated September 11, 2014,

#181337v3

Apple's decision to not put sapphire screens in its new iPhones may have been due to manufacturing issues with GTAT:

> Apple's apparent decision to not put sapphire screens on its new iPhones has broken the market value of GT Advanced Technologies. From Apple's introduction of its new iPhone [on] Tuesday through Wednesday's close, GT Advanced shares plunged more than 25%.
>
> But investors should have seen the cracks coming. GT Advanced is building a sapphire-manufacturing facility in Arizona in partnership with Apple, which already uses the highly durable material in parts of its iPhone 5S. Many investors had speculated sapphire would replace Gorilla Glass as the cover material for Apple's newest smartphones. Yet the company told investors in early August that its facility wouldn't be fully online until next year – too late to be shipping in volume for the iPhone 6.

76.     Moreover, according to a *Time* article dated September 15, 2014, Apple may have never actually targeted sapphire displays for the iPhone 6 and may not use sapphire materials for anything other than the Apple Watch going forward:

> Many have suggested that the decision not to use sapphire was the result of manufacturing issues – that with more time, Apple would have used sapphire screens for the iPhone 6. As I looked closer at the Apple announcement, and after looking more at the benefits and drawbacks of sapphire, it seems that Apple had good reasons to go with ion-strengthened curved glass (Gorilla Glass) instead of sapphire.
>
> While sapphire has been hyped as an alternative screen cover for smartphones, the continued use of strengthened glass has less to do with production issues and more to do with what smartphone manufacturers know about consumers, their preferences and, more importantly, how people actually use phones and what they're willing to pay for them.
>
> By the way, some reports stated that up until a few weeks before the iPhone announcement, Apple was going to use sapphire but dropped it because of yield issues. This is not true. My sources tell me that sapphire was never targeted for the iPhone 6 or 6 Plus and its role in future iPhones hasn't even been decided yet. Also, anyone who knows the manufacturing process knows that to make

32

tens of millions of screens for an iPhone launch, the orders for those screens had to be put in place well over six months ago and planned meticulously into the final manufacturing of these new smartphones.

\*       \*       \*

I don't doubt that over time, there could be some breakthroughs with sapphire and new coating processes that could make it possible to use on a smartphone. However, from the research I did, it does not appear that it could happen anytime soon. Plus, sapphire's less flexible and more brittle nature suggests, at least to me, that using it in large-screen smartphones would still be difficult – even if it was possible to coat it in a way to keep the screen from splintering. I now at least understand why Apple didn't use it in the new iPhones – and the more I study this, it seems that it could be problematic for Apple to use sapphire outside of its smartwatch line anytime in the near future.

77.    On September 15, 2014, GTAT common stock declined $0.94 per share or more than 7%, to close at $11.88 per share.

78.    On October 6, 2014, at approximately 9:40 a.m. Eastern Standard Time, trading of GTAT common stock was halted on the NASDAQ due to pending news.

79.    On October 6, 2014, at approximately 10:09 a.m. Eastern Standard Time, the Company issued a press release disclosing that it had, together with certain of its direct and indirect subsidiaries, commenced voluntary cases under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire.  According to the press release, GTAT expects that the Bankruptcy Court will allow the Company "to continue to conduct business as usual while it devotes renewed efforts to resolve its current issues and develops a reorganization plan."   The Company revealed that as of September 29, 2014, it had approximately $85 million of cash.  In the press release, Defendant Gutierrez believed that the Company "has a strong and fundamentally sound underlying business" but that bankruptcy "provides us with the opportunity to continue to execute our business plan on a stronger footing,

33

maintain operations of our diversified business, and improve our balance sheet."   In the court documents associated with GTAT's Chapter 11 filing, the Company stated that it is "facing a severe liquidity crisis."

80.     On this news, GTAT common stock declined $10.25 per share or more than 92%, to close at $0.80 per share on October 6, 2014.

81.     Media reports and securities analysts immediately pointed to a breakdown in GTAT's relationship with Apple, and Apple's subsequent decision to not use sapphire displays in its new iPhones, as the primary cause of the Company's bankruptcy filing.   For example, according to a *Forbes* article dated October 7, 2014, GTAT's bankruptcy filing was due to its "frayed relationship" with Apple:

> When GT Advanced inked a deal with Apple to receive $578 million in advance payments for sapphire material, it wasn't completely clear what was going on. But over time, GT's forecasts of revenues from sapphire eclipsing $1 billion made it clear the company believed all that sapphire would eventually be used to protect the screens of nearly every iPhone sold. Somewhere between those heady days of February [2014] and the launch of the iPhone 6 in September, whatever GT and Apple had planned had already gone awry. No models of Apple's new phones were announced with sapphire and even the new Apple Watch wouldn't be using it on the least expensive – and likely most popular – model. GT, Apple's new best friend last November, had already fallen from favor. Yesterday, due in large part to that frayed relationship, GT declared bankruptcy. It still owes Apple a good chunk of that $578 million.
>
> \*         \*         \*
>
> With Apple typically silent, the best speculation is that things fell apart at two stages of the process. First, GT couldn't deliver the expected quantities soon enough. That might have limited sapphire to perhaps only the top-end models of the iPhone 6 much like the way only the Plus offers optical image stabilization on its camera. Second, the slight curved edge of the design meant that the thin sheets of sapphire would require delicate finishing to join with the similarly curved metal back. That stage of the process apparently

34

went poorly. [Analysts] cited trouble with the finishing stage as a likely reason for Apple pulling the plug.

82.     According to a *Wall Street Journal* article published on October 6, 2014, "Apple's decision not to use sapphire followed tests in which the synthetic sapphire proved brittle, cracking when phones were dropped from various heights and angles, according to people familiar with the matter."  Furthermore, according to this article, "the final straw for GT [that precipitated the bankruptcy filing] appears to be Apple withholding a $139 million payment, according to people familiar with the matter."

83.     According to a *Wall Street Journal* article published on October 8, 2014, GTAT's cash position had deteriorated quickly after the Company's Second Quarter 2014 earnings report and that this led to the bankruptcy filing:

> GT's Monday filing for bankruptcy protection seemed to surprise everyone. Even analysts who were bearish on the maker of sapphire material due to concerns about cash flow figured the company would be able to raise more capital. But things deteriorated quickly, as the company seemed to burn through about $248 million in cash in a single quarter.
>
> That may have led to the company's filing, since its cash, at $85 million, was below a $125 million trigger point that would allow Apple to demand repayment of about $440 million in loans it had advanced. Apple had agreed to lend GT a total of $578 million to help get a large sapphire factory in Arizona up and running. The tech giant reportedly withheld the last $139 million payment it was due to make, although it isn't clear why.
>
> What is obvious is that GT effectively bet the house on a new technology with a new business model and made itself dependent on a single customer: Apple.

84.     Securities analysts echoed this analysis.  In an investor note, Raymond James analyst Pavel Molchanov stated that "it would appear that something very fundamentally broke down in the relationship between Apple and GT Advanced" and that the "inference is that there

35

were negotiations with Apple as recently as last week [the week before the bankruptcy filing], but the hoped-for breakthrough failed to materialize, leaving Chapter 11 as the only practical option for GT." Similarly, in an investor note, Cowen and Co. analyst Jeffrey Osborne stated that "the company appears to have bitten off more than it can chew in regards to the relationship with Apple" and posited that Apple "had the ability to call the interest-free loan back and it appears they have done that." Furthermore, in an investor note, Pacific Crest analyst Weston Twigg indicated that "the Apple relationship [with GTAT] will likely end, in our view, with Apple likely taking over the ownership of the factory equipment and exercising rights to use GT IP." Finally, in an investor note, Gilford Securities Inc. analyst Nimal Vallipuram stated that Apple may have requested earlier repayment due to "unmet performance targets."

## VIII.   **SCIENTER ALLEGATIONS**

85.     As alleged herein, Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding GTAT, their control over, and/or receipt and/or modification of GTAT's allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

86.     Defendants had actual knowledge that: the Company was in a precarious financial position; that the Company's revenue guidance was inflated because GTAT would be unable to meet all of the requirements under the Apple Agreements; that GTAT would not receive the final $139 million prepayment from Apple; and that GTAT would not end the year with $400 to $450

million in cash on its balance sheet.  Inasmuch as GTAT subsequently filed for bankruptcy on October 6, 2014, only two months after it represented that it was "currently in compliance" with the operating metrics and financial covenants in the Prepayment Agreement would "have sufficient cash resources to fund operations for at least the next twelve months" in its Second Quarter 2014 10Q, there is a strong inference that Defendants had actual knowledge that it was facing an impending liquidity crisis.

87.     Defendants, by virtue of their public statements during the Class Period – and as confirmed by analysts' comments after the end of the Class Period – had conditioned investors to expect that the Apple Agreements would be accretive to earnings in 2014 and that the Company was in a "good capital position."

## IX.    LOSS CAUSATION

88.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of GTAT securities and operated as a fraud or deceit on Class Period purchasers of GTAT securities by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed, or materialized, and became apparent to the market, the price of GTAT securities fell precipitously.  As a result of their purchases of GTAT securities during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

89.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of GTAT's business and prospects, financial position, and results of operations.  Defendants' false and misleading statements caused GTAT's securities to trade at artificially inflated levels throughout the Class Period.

90.     The decline in value of the common was a direct result of the nature and extent of

Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline of GTAT securities negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and caused the subsequent significant decline in the value of GTAT securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X.    NO SAFE HARBOR

91.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements set forth in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Cautionary language must truthfully address specific risks, must exhaust the capacity of the false statements to mislead investors, and must disclose, as Defendants failed to do here, then existing adverse facts.  Alternatively, to the extent that the statutory safe harbor is intended to or does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading, by virtue of their communications with Apple and other third parties, and/or that the forward-

38

looking statement was authorized and/or approved by an executive officer of GTAT who knew that those statements were false when made.  In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

92.     The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or omissions of existing material facts.

## XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET

93.     Plaintiff is entitled to a presumption of reliance because the claims asserted herein against Defendants are predicated in part upon false statements of material fact and/or the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, that Defendants had a duty to disclose.

94.     At all relevant times, the market for GTAT securities was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.

95.     The market for GTAT securities was efficient because, inter alia, throughout the Class Period:

> a.  GTAT securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   During the Class Period, there were approximately 138 million shares of GTAT common stock outstanding, millions of shares of GTAT common stock were traded on the open market; with trading in excess of a million shares a day on the vast majority of days during the Class Period;

c.   As a regulated issuer, GTAT filed periodic public reports with the SEC and the NASDAQ;

d.   GTAT regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as quarterly conference calls with investors, communications with the financial press and other similar reporting services, as well as presentations and various industry and market symposia and conferences; and

e.   Securities analysts followed and published research reports regarding GTAT that were publicly available to investors, including, securities analysts employed by the following firms, among others: Mike J. Ritzenthaler at Piper Jaffray, Jonathan Dorsheimer at Canaccord Genuity, and Pierre Maccagno at Dougherty & Company LLC.  Each of these analysts wrote reports about GTAT that were distributed to the sales force and available to customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

40

96.     Throughout the Class Period, GTAT was consistently followed by the market, including securities analysts as well as the business press.   The market relies upon the Company's financial results and management to accurately present the Company's financial results.   During this period, GTAT and the Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company.   This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's securities.

97.     As a result of the misconduct alleged herein (including defendants' misstatements and omissions of material facts), the market for GTAT's securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the market" theory applies.   Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions of material facts for which defendants are each responsible.

98.     Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of GTAT securities at artificially inflated prices and the subsequent decline in the price of the securities when the truth was disclosed.

99.     The market for GTAT securities promptly digested current information regarding GTAT from all publicly available sources and reflected such information in GTAT's securities price.   Under these circumstances, all purchasers of GTAT's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

## XII.   CAUSES OF ACTION

### COUNT I
### (Against All Defendants)
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

#181337v3

100.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

101.     Throughout the Class Period, Defendants, directly or indirectly, engaged in a common plan, scheme and continuing course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of GTAT securities.

102.     The purpose and effect of Defendants' plan, scheme and course of conduct were to artificially inflate the price of GTAT's securities and to artificially maintain the market price of GTAT securities.

103.     Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with severely reckless disregard for the truth when it failed to ascertain and disclose the true facts in the statements made by it to members of the investing public, including Plaintiff and the Class, and the securities analysts.

104.     As a result of the foregoing, the market price of GTAT securities was artificially inflated during the Class Period.   In ignorance of the falsity of Defendants' statements concerning the Company's relationship with Apple, as well as the Company's capital position, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of GTAT securities during the Class Period in

#181337v3

purchasing GTAT securities at prices which were artificially inflated as a result of Class's false and misleading statements.

105.    Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased GTAT securities in ignorance of the financial risk to them as a result of such nondisclosures.

106.    As a result of the wrongful conduct alleged herein, when the truth concerning Defendants' false statements and omissions was revealed to the investing public and the artificial inflation in the price of GTAT securities was, as a result, reduced and ultimately removed, in a series of corrective disclosures and/or the materialization of the concealed risks, GTAT's share price fell significantly and Plaintiff and other members of the Class suffered damages in an amount to be established at trial.

107.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Plaintiff and the other members of the Class for substantial damages that they suffered in connection with their purchase of GTAT securities during the Class Period.

### COUNT II
### (Against All Defendants)
### Liability Pursuant to Section 20(a) of the Exchange Act

108.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

109.    Each of the Defendants, by virtue of their positions with GTAT and their specific acts, was a controlling person of GTAT within the meaning of Section 20(a) of the Exchange Act.

110.    They had the power and influence and exercised same to cause GTAT to engage in the illegal conduct and practices complained of herein.   Defendants were thereby and

43

otherwise active and culpable participants in the fraud perpetrated by Defendants.

111.     By reason of the conduct of GTAT as alleged in this Complaint, Defendants are liable for the aforesaid wrongful conduct of GTAT and liable to Plaintiff and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of shares as a result of GTAT's violations of the Exchange Act.

112.     By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Certifying Plaintiff as the Class Representative and its counsel as Class Counsel;

C.     Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.     Awarding monetary damages against Defendants in favor of Plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.     Awarding Plaintiff and the Class its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.     Granting such other and further relief as deemed appropriate by the Court.

## XIV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

#181337v3

Dated: October 15, 2014

Respectfully submitted,
MALLORY & FRIEDMAN, PPLC

By:  /s/ Mark L. Mallory
Mark L. Mallory, NH Bar No. 1599
Mallory & Friedman, PLLC
3 North Spring Street
Concord, NH 03301
(603) 228-2277
mark@malloryandfriedman.com

*Local Counsel for Plaintiff John
Boccabella*

WOLF POPPER LLP
Lester L. Levy
Robert C. Finkel
Fei-Lu Qian
Roy Herrera Jr.
845 Third Avenue
New York, NY 10022
Tel:  (212) 759-4600
Fax:  (212) 486-2093

LAW OFFICES OF JAMES V.
BASHIAN, P.C.
James V. Bashian
500 Fifth Avenue, Suite 2700
New York, NY 10110
Tel: (212) 921-4110
Fax: (212) 921-4249

*Counsel for Plaintiff John
Boccabella*

#181337v3